**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| G.S., by and through her parents and | : | |
| next friends, L.S. and R.S., | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:16–cv–1355 (JCH) |
| | : | |
| v. | : | |
| | : | JULY 7, 2017 |
| FAIRFIELD BOARD OF EDUCATION, | : | |
| Defendant. | : | |

**RULING RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 34 & 35)**

**TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................... 2

II.  BACKGROUND ........................................................................................... 3

  A.  Facts ...................................................................................................... 3

  B.  Procedural History: Due Process Hearing ........................................... 9

III.  LEGAL STANDARDS ................................................................................ 11

  A.  IDEA Framework .................................................................................. 11

  B.  Motion for Summary Judgment in IDEA Cases: Standard of Review ................ 14

IV.  DISCUSSION ........................................................................................... 17

  A.  Ninth Grade (2015–16) ....................................................................... 17

    1.  Fairfield's IEP as a FAPE .............................................................. 18

    2.  Spire School as an Appropriate Placement ................................... 22

    3.  Equitable Considerations .............................................................. 27

  B.  Eighth Grade (2014–15) ..................................................................... 32

    1.  Bullying ......................................................................................... 34

    2.  Fairfield's IEP as a FAPE .............................................................. 38

      a.  Emotional Support ..................................................................... 39

      b.  Executive Functioning ................................................................ 41

      c.  Writing Goals .............................................................................. 44

V.  CONCLUSION .......................................................................................... 47

## I.   INTRODUCTION

Plaintiff G.S. ("Student") filed this suit to contest certain conclusions of a Hearing Officer appointed by the Connecticut State Department of Education to hear her claims that defendant Fairfield Board of Education ("Fairfield" or "the Board") violated the Individuals with Disabilities Education Act ("IDEA"). <u>See generally</u> Compl. (Doc. No. 1) ¶¶ 22–29.  Fairfield has filed a counterclaim, in which it alleges error in other portions of the Hearing Officer's Final Decision and Order. <u>See generally</u> Answer (Doc. No. 19) at 7 ¶ 1 – 12 ¶ 13.

Each party has filed a Motion for Summary Judgment.  Student's Motion seeks a ruling from this court: (1) affirming the Hearing Officer's determination that the 2015–16 Individualized Education Program ("IEP") proposed by Fairfield was not appropriate; (2) affirming the Hearing Officer's determination that the Spire School was an appropriate placement for Student; (3) reversing the Hearing Officer's determination that Fairfield need not reimburse Student's parents ("Parents") for the costs of their unilateral placement of Student at the Spire School for the 2015–16 school year, due to equitable considerations; (4) reversing the Hearing Officer's determination that the 2014–15 IEP was appropriate; and (5) reversing the Hearing Officer's determination that the 2014–15 IEP did not need to be modified in light of several incidents Student perceived as bullying. <u>See</u> Pl.'s Mot. for Summ. J. on Administrative R. ("Pl.'s Mot." or "Plaintiff's Motion") (Doc. No. 34) at 1–2.  Fairfield's Motion asks this court to reverse the Hearing Officer's determination that the 2015–16 IEP was not appropriate, and to reverse the Hearing Officer's determination that the Spire School was an appropriate placement. <u>See</u> Def.'s Mot. for Summ. J. ("Def.'s Mot." or "Defendant's Motion") (Doc. No. 35) at 1.

Both parties have filed Oppositions to their opponent's Motion, <u>see generally</u> Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n" or "Defendant's Opposition") (Doc. No. 38); Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n" or "Plaintiff's Opposition") (Doc. No. 41), and Replies in support of their own Motion, <u>see generally</u> Pl.'s Reply to Def.'s Obj. to Pl.'s Mot. for Summ. J. ("Pl.'s Reply" or "Plaintiff's Reply") (Doc. No. 42); Reply Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply" or "Defendant's Reply") (Doc. No. 43).

For the reasons set forth below, Student's Motion is **GRANTED IN PART AND DENIED IN PART**, and Fairfield's Motion is **DENIED**.

## II. BACKGROUND

### A. Facts[1]

When she was in kindergarten, Student was diagnosed with Attention Deficit Hyperactivity Disorder—Predominantly Inattentive Type. <u>See</u> Pl.'s Local Rule 56(a)1 Statement ("Pl.'s L.R. 56(a)1") (Doc. No. 34-2) at 2 ¶ 3. Several years later, on June 17, 2011, Student was determined to be eligible for special education and services. <u>See</u> <u>id.</u> at 2 ¶ 4. Student also has spinal issues, which have resulted in two surgical procedures and in her ongoing use of a wheeled backpack. <u>See</u> <u>id.</u> at 2–3 ¶¶ 5–6.

The school years most relevant in this case are Student's seventh grade year (2013–14), eight grade year (2014–15), and ninth grade year (2015–16). For her seventh and eighth grade years, Student attended public school. For her ninth grade

---

[1] Unless otherwise noted, the parties have indicated that these facts are undisputed, by way of statements in their respective Local Rule 56(a) filings. <u>See generally</u> Pl.'s Local Rule 56(a)1 Statement ("Pl.'s L.R. 56(a)1") (Doc. No. 34-2); Def.'s Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1") (Doc. No. 35-2); Def.'s Local Rule 56(a)2 Statement ("Def.'s L.R. 56(a)2") (Doc. No. 38-1); Pl.'s Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2") (Doc. No. 41-1). The facts set forth above are limited to those necessary to rule on the pending Motions.

year, Student attended the Spire School, after a unilateral placement by her parents. Over the course of these three years, nine planning and placement team ("PPT") meetings were held.  See id. at 4 ¶ 12.

In the 2013–14 (seventh grade) school year, Student's IEP included certain special education services: "2.10 hours of writing instruction weekly in the general education setting, 1.67 hours of weekly small group/individual learning strategies instruction, [ ] .7 hours a week of small group/individual academic support," and .7 hours per week of occupational therapy, but no counseling.  See id. at 4 ¶ 14.  Student's teachers kept track of Student's behaviors relevant to her IEP goals, and occasionally sent this information to Student's parents ("Parents").  See id. at 4 ¶ 15.  However, Parents' requests for such information were sometimes fulfilled only after a significant delay or not at all.  See id. at 5 ¶ 16.

During the 2013–14 school year, Student was upset by several interactions, one with a teacher and others with her peers.  In September 2013, Student reported that, when she forgot a pen and pencil, her Spanish teacher told the class that someone should lend Student a pencil, because Student chews on pencils.  See id. at 6 ¶ 20. Other students in the class laughed at the teacher's remark, and when Student tried to return the pen she had borrowed, her classmate threw away the pen and elicited more laughter directed at Student.  See id.  In May 2014, a different classmate—though one who was also in Student's Spanish class—made a mean-spirited comment to Student. See id. at 6 ¶ 21.  Last, in June 2014, Student was upset by another student's comments regarding Student's late arrival to class.  See id. at 6 ¶ 22.  Fairfield does not dispute the occurrence of these events, but suggests they were promptly investigated

and the individuals involved in each incident were appropriately disciplined. See Def.'s Local 56(a)2 Statement ("Def.'s L.R. 56(a)2") (Doc. No. 38-1) at 2 ¶ 20 – 3 ¶ 22.

Writing objectives that had been included in Student's March 2014 IEP were not present in her May 2014 IEP. In October 2014, at Parents' request, a PPT meeting was convened, at which writing goals were added to Student's then-operative IEP. See Pl.'s L.R. 56(a)1 at 5 ¶ 18. Parents hired a private writing tutor to work with Student in October 2014. See id. at 5 ¶ 19. After Student had an upsetting experience at the summer program in which she took part between seventh and eighth grades, Parents hired Dr. Timothy Heitzman to begin counseling Student, in an effort to address social, emotional, and executive functioning issues. See id. at 6 ¶ 23.

Student's IEP for the 2014–15 (eighth grade) school year contained the following special education services: "2.10 hours of writing instruction weekly in the general education setting, 1.67 hours of weekly small group/individual learning strategies instruction, [ ] [1.4] hours a week of small group/individual academic support," and .5 hours per week of occupational therapy. See id. at 7 ¶ 25. Though the IEP was modified in October 2014 to reflect that Student's "behavioral/social/emotional development was not age appropriate," the IEP did not include any goals or objectives to address this need until April 2015. See id. at 7 ¶ 26. In May 2015, Student began to receive thirty minutes of counseling every two weeks. See id. at 7 ¶ 25.

As she had during her seventh grade year, Student reported being upset by several incidents during the 2014–15 school year. In October 2014, Student claimed that a classmate made fun of her in Art class and, later, that the same peer had taken pictures of her at an off-campus event. See id. at 7–8 ¶ 25. Fairfield does not dispute

that Student made these allegations, but asserts that they were investigated and could not be substantiated. See Def.'s L.R. 56(a)2 at 6–7 ¶¶ 5–6. Student's mother ("Mother") also spoke with a school dean about her concern that several students had pushed past Student in a buffet line during an overnight field trip to Philadelphia. See Pl.'s L.R. 56(a)1 at 8 ¶ 30. Again, Fairfield acknowledges that Mother relayed her concerns, but suggests that Student was not able to identify any student involved in the alleged occurrence. See Def.'s L.R. 56(a)2 at 7 ¶ 7. Last, in May 2015, Mother reported to school officials that Student claimed students had been kicking Student's wheeled backpack. See Pl.'s L.R. 56(a)1 at 8 ¶ 29. Once more, Fairfield admits that Mother reported Student's perceptions, but school officials could not substantiate them after investigation. See Def.'s L.R. 56(a)2 at 3 ¶ 29; id. at 7–8 ¶ 8.

Leading up to the PPT meeting to plan for Student's ninth grade year, Mother learned that Fairfield would recommend that Student enroll in "collaborative classes," taught by both a special education teacher and a regular education teacher and containing both special education students and other students. See Pl.'s L.R. 56(a)1 at 8 ¶ 31; Def.'s L.R. 56(a)2 at 4 ¶ 31. On April 2, 2015, Dr. Heitzman sent an email to school officials with questions about Student's proposed schedule for ninth grade, and indicated his belief that "placement with an equivalent social peer group need[ed] to take priority over learning-needs peer group." Pl.'s L.R. 56(a)1 at 8 ¶ 32. Mother also met with Fairfield's Director of Special Education in early April 2015 regarding Student's concerns about placement in a collaborative classroom and to discuss alternative options. Pl.'s L.R. 56(a)1 at 8 ¶ 33.

On April 21, 2015, the PPT convened to discuss the appropriate placements for Student's ninth grade year. See id. at 9 ¶ 34. Notably, in February 2015, Student had been accepted into an aquaculture program in Bridgeport for the following school year. Pl.'s Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2") (Doc. No. 41-1) at 2 ¶ 3. Student suggests that, as of April 2015, she was expected to attend the aquaculture program for part of the day, requiring the PPT to develop an appropriate program for the remainder of the day. See id. Fairfield recommended the following placements for Student's 2015–16 school year: collaborative classes for English, Global Studies, and Math; Learning Center Support for 2 hours and 45 minutes each four-day cycle; 30 minutes per week of occupational therapy and an occupational therapy consultation once per month; and 30 minutes of counseling every two weeks. See Pl.'s L.R. 56(a)1 at 9 ¶ 34. Three days after the PPT meeting, Mother sent an email to Fairfield officials, requesting that Dr. Heitzman be permitted to observe ninth grade collaborative classes. See id. at 9 ¶ 35. That request was denied, as were subsequent requests by Parents to observe the collaborative classes. See id.

Student attended an orientation for the aquaculture program on May 21, 2015. See Pl.'s L.R. 56(a)2 at 8 ¶ 21. There, Student saw children who she thought had bullied her in middle school. See id. at 8 ¶ 22.

In June 2015, Parents hired Dr. Laura Seese to serve as a private education consultant. See id. at 8 ¶ 23. Dr. Seese is a certified school psychologist and school administrator. See id. at 8 ¶ 24. Based on Student's records, an interview with Mother, and an interview with Student, Dr. Seese prepared a report for Parents in August 2015. See id. at 9 ¶¶ 27–28. In preparing that report, Dr. Seese did not speak with Fairfield

teachers or officials.  See id. at 9 ¶ 29.  Ultimately, Dr. Seese suggested that 30 minutes

of counseling every two weeks was insufficient to address Student's needs, see id.

at 9–10 ¶ 31, and recommended that Student be placed at the Spire School, see Pl.'s

L.R. 56(a)1 at 9–10 ¶ 36.

Within the first ten days of August, Parents informed Fairfield, in writing, of their

intent to unilaterally place Student at the Spire School for the 2015–16 school year.

See Pl.'s L.R. 56(a)1 at 10 ¶ 37; Def.'s L.R. 56(a)2 at 5 ¶ 37.  On August 22, 2015, Dr.

Seese completed her report and Parents provided Fairfield with a copy.  See Pl.'s

L.R. 56(a)1 at 10 ¶ 37.  Three days later, Parents executed an enrollment contract with

the Spire School.  See id.

A PPT meeting was subsequently convened on September 11, 2015, after

Student had begun ninth grade at the Spire School.  See id. at 10 ¶ 38.  At that meeting,

the PPT added a collaboratively taught science class to Student's IEP, see id., and

Fairfield suggested that Student participate in an intake process with Effective School

Solutions ("ESS"), a contractor that Fairfield had engaged to provide services to

students with certain mental health issues, see id. at 10 ¶ 39; Pl.'s L.R. 56(a)2 at 12

¶ 39.  Parents declined the intake interview, and the IEP's provision of 30 minutes of

counseling every two weeks remained the same.  See Pl.'s L.R. 56(a)1 at 10 ¶ 40.  At

the September 11, 2015 meeting, Fairfield denied Parents' requested placement of

Student at the Spire School.  See id.

The Spire School is a state-approved special education school, with all of its

teachers certified by the Connecticut Department of Education.  See Pl.'s L.R. 56(a)2

at 14 ¶¶ 46–47.  In order to be eligible for admission to the Spire School, students must

have mild to moderate learning disabilities, social or emotional needs, and be performing academically at or above grade level.  See id. at 14 ¶ 48.  The Spire School provides occupational therapy and employs a clinical psychologist, licensed professional counselor, social worker, and two school counselors, any of whom Student can meet and/or speak with.  See id. at 14 ¶¶ 49–50.  The Spire School follows the same general core curriculum as public schools in Connecticut.  See id. at 14 ¶ 57.  Many of Student's classes have only a few other students in them, and Student was the only student in at least one of her classes.  See id. at 14 ¶¶ 63–64.

B.    Procedural History: Due Process Hearing

A Hearing Officer appointed by the Connecticut Department of Education heard testimony and received evidence from Student and from Fairfield, regarding the lawfulness of the education provided by Fairfield.  On July 21, 2016, the Hearing Officer rendered her decision.  See Final Decision & Order ("H.O. Decision") at 1.[2]  In the course of adjudicating the dispute before her, the Hearing Officer made findings of fact, see generally id. at 3–16, as well as conclusions of law, see generally id. at 16–22.  The Hearing Officer reached five conclusions that are at issue in this case.

First, the Hearing Officer determined that the "proposed IEP for the 2015-2016 school year was not appropriate . . . because the therapeutic services offered were not sufficient for Student who was transitioning to high school and who suffers from significant anxiety which exacerbates her executive functioning issues."  See id. at 17 ¶ 3.

_____

[2] The Hearing Officer's Final Decision and Order—filed manually along with the rest of the administrative record—is also available online, at
http://www.sde.ct.gov/sde/lib/sde/PDF/DEPS/Special/Hearing_Decisions/2016/16_0165.pdf.

Second, the Hearing Officer concluded that the Spire School qualified as "appropriate," at least for the purposes of a unilateral placement.  See id. at 20 ¶ 6.

Third, the Hearing Officer decided that tuition reimbursement for Student's ninth grade year was not warranted.  See id. at 20–21 ¶ 6.  Because Parents refused to take part in the intake process for ESS, the Hearing Officer concluded that reimbursement for Student's tuition at the Spire School was inappropriate.  See id.

Fourth, in performing the test set out in T.K. v. New York City Department of Education, 779 F. Supp. 2d 289 (E.D.N.Y. 2011), the hearing officer applied the definition of "bullying" set out in section 10-222d of the Connecticut General Statutes, which the Officer determined was not prohibited.  See id. at 17–19 ¶ 5.  Under that definition, the incidents about which Student complained did not qualify as "bullying." See id.  However, the Hearing Officer also noted that, even assuming arguendo that the reported incidents did qualify as "bullying," Fairfield neither was deliberately indifferent to nor failed to take reasonable steps to prevent them.  See id. at 19 ¶ 5 (discussing "third prong" of four-part test set out in T.K. v. N.Y.C. Dep't of Educ., 779 F. Supp. 2d 289 (2011)).

Fifth, and finally, the hearing officer concluded that Student was not denied a free appropriate public education ("FAPE") for the 2014–15 school year as a result of Fairfield's failure to include writing goals until October 2014.  See id. at 17 ¶ 4.  The hearing officer rejected all of Student's arguments that the 2014–15 IEP was not appropriate.  See id. at 22 ¶ 2.

III. **LEGAL STANDARDS**

A. <u>IDEA Framework</u>

The IDEA is designed, in large part, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living . . . ." 20 U.S.C. § 1400(d)(1)(A). At the heart of the IDEA is the requirement that public schools provide a free appropriate public education ("FAPE") to children with disabilities. <u>See</u> 20 U.S.C. § 1412(a)(1)(A) (requiring that state provide "[a] free appropriate public education . . . to all children with disabilities residing in the [s]tate between the ages of 3 and 21 . . . ."). In order to comply with the IDEA's mandates, a FAPE must provide "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." <u>Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1</u>, 137 S. Ct. 988, 1001 (2017).

School districts are subject to a number of substantive and procedural requirements, all focused on providing disabled children with FAPEs. Most notably, school districts must develop an individualized education program ("IEP") for each student with a disability. <u>See generally</u> 20 U.S.C. § 1414(d). IEPs are written statements that set forth annual goals for disabled children, <u>see</u> 20 U.S.C. § 1414(d)(1)(A)(i)(II), the way in which progress towards those goals will be measured and reported, <u>see</u> 20 U.S.C. § 1414(d)(1)(A)(i)(III), and a description of the services that will be provided to disabled children to enable them to achieve these goals, <u>see</u> 20 U.S.C. § 1414(d)(1)(A)(i)(IV). IEPs must be reviewed periodically, but no less often

than once per year, to determine whether the child is achieving the annual goals set out in the IEP, and must be revised to address, inter alia, "any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate . . . ." See 20 U.S.C. § 1414(d)(4)(A).

In reviewing the adequacy of an IEP, the "question is whether the IEP is reasonable, not whether the court regards it as ideal." Endrew F., 137 S. Ct. at 999. As noted above, the IDEA requires that a FAPE must provide "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Id. at 1001. The "IDEA does not require a school district to furnish 'every special service necessary to maximize each handicapped child's potential.'" D.B. v. Ithaca City Sch. Dist., No. 16-3491-cv, 2017 WL 2258539, at *3 (2d Cir. May 23, 2017) (summary order) (quoting Board of Educ. v. Rowley, 458 U.S. 176, 199 (1982). Indeed, the Second Circuit has noted that disabled students are entitled only to an "appropriate education, not one that provides everything that might be thought desirable by loving parents." Bryant v. N.Y.S. Educ. Dep't, 692 F.3d 202, 215 (2d Cir. 2012) (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 132 (2d Cir. 1998)).

If, however, a child has previously received special education services from a school district and parents enroll a disabled child in a private school without the district's consent, "a court or a hearing officer may require the [district] to reimburse the parents for the cost of that enrollment" if the district has not provided a FAPE in a timely manner, prior to enrollment in the private school. 20 U.S.C. § 1412(a)(10)(C)(ii). In certain situations, however, reimbursement for the parents' enrollment costs may be

reduced or denied.  See 20 U.S.C. § 1412(a)(10)(C)(iii).  For parents to receive

reimbursement for tuition costs stemming from a "unilateral placement" in a private

school—that is, when parents enroll their child in private school without the district's

consent—parents must show that: (1) the school district failed to provide the disabled

child with a FAPE; (2) they placed the student in an appropriate private school; and (3)

that the equities favor reimbursement.  See J.C. v. Katonah-Lewisboro Sch. Dist.,

No. 16-1838, 2017 WL 1906729, at *1 (2d Cir. May 9, 2017) (summary order) (citing

C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 73 (2d Cir. 2014)).

       As a general matter, "the same considerations and criteria that apply in

determining whether the [s]chool [d]istrict's placement is appropriate should be

considered in determining the appropriateness of the parents' placement."  Frank G. v.

Bd. of Educ. of Hyde Park, 459 F.3d 356, 364 (2d Cir. 2006).  That standard has been

set out in some detail just above.  See supra at 11–12 (citing Endrew F., 137 S. Ct. at

992).  However, this general rule—that courts conduct the same inquiry to determine if a

private placement is "appropriate" as they do to determine if a school district's

placement is "appropriate"—is subject to certain exceptions.  For example, the private

placement may be "appropriate" even if it does not meet the definition of a "free

appropriate public education."  See Frank G., 459 F.3d at 364; cf. 20 U.S.C. § 1401(9)

(defining FAPE).  More specifically, private placements need not "meet state education

standards or requirements" and need not "provide certified special education teachers

or an IEP for the disabled student," in order to be considered "appropriate."  See Frank

G., 459 F.3d at 364 (citations omitted).  Parents also "may not be subject to the same

mainstreaming requirements as a school board." Id. (quoting M.S. ex rel. SS. v. Bd. of Educ. of City Sch. Dist. of City of Yonkers, 231 F.3d 96, 105 (2d Cir. 2000)).

In determining whether the equities favor reimbursement for a private placement, "the district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (citing Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 16 (1993)). "Important to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA." C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 840 (2d Cir. 2014) (citing Warren G. ex rel. Tom G. v. Cumberland Cty. Sch. Dist., 190 F.3d 80, 85–86 (2d Cir. 1999)). However, both the Second Circuit and other courts in this District have held that parents' subjective intent regarding whether they will keep their child in public school has no relevance to the equitable analysis, absent some "relevant manifestation of that intent . . . ." A. v. Greenwich Bd. of Educ., No. 3:15–cv–203 (CSH), 2016 WL 3951052, at *19 (D. Conn. July 20, 2016); see also C.L., 744 F.3d at 840.

B.    Motion for Summary Judgment in IDEA Cases: Standard of Review

"IDEA appeals are generally resolved in full via cross-motions for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure." A., 2016 WL 3951052, at *8. "Though the parties in an IDEA action may call the procedure a motion for summary judgment, the procedure is in substance an appeal from an administrative determination not a summary judgment motion." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 226 (2d Cir. 2012) (quoting Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.2d 77, 83 n.3 (2d Cir. 2005)). "[A] motion for summary

judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact.  Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in the IDEA . . . and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits."  Id. at 225–26(quoting Lillbask, 397 F.2d at 83 n.3).  The court must "grant such relief as [it] determines is appropriate," based on a preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C)(iii).

The IDEA sets up a system in which "responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers," whose rulings are "then subject to 'independent' judicial review."  Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).  "[D]istrict court[s] must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence," but "the Supreme Court has cautioned that such review is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191–92 (2d Cir. 2005) (quotation marks and citations omitted).  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  Walczak, 142 F.3d at 129 (quoting Board of Educ. v. Rowley, 458 U.S. 176, 205 (1982)).

The Second Circuit has instructed that courts "must defer to the administrative decision [of the hearing officer] particularly where the state officer's review has been thorough and careful." D.B. v. Ithaca City Sch. Dist., No. 16-3491-cv, 2017 WL 2258539, at *3 (2d Cir. May 23, 2017) (summary order) (quoting M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ., 725 F.3d 131, 138–39 (2d Cir. 2013)).  In M.H. v. New York City Department of Education, 685 F.3d 217 (2d Cir. 2012), the Second Circuit rejected the invitation to create a bright-line rule as to the measure of deference to be afforded different types of determinations by the hearing officer, see 685 F.3d at 243–44, and instead set forth a more holistic framework:

> In many determinations made by administrative officers, the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court. But the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role.  As the Supreme Court made clear in [Board of Education of Hendrick Hudson Central School District, Westchester County v.] Rowley, [458 U.S. 176 (1982),] the purpose of the IDEA is to provide funding to states so that they can provide a decent education for disabled students consistent with their traditional role in educating their residents.  In policing the states' adjudication of IDEA matters, the courts are required to remain conscious of these considerations in determining the weight due any particular administrative finding.

> By way of illustration, determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.  Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress.  Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not.  And the district court should afford more deference when its review is based entirely on the same evidence as that before the [hearing officer] than when the district court has before it additional evidence that was not considered by the state agency.

685 F.3d at 244 (citations omitted). In evaluating challenges to different aspects of a hearing officer's decision, the court must evaluate each conclusion in turn to determine how much deference it is due.

## IV. DISCUSSION

The court's analysis of the issues raised by the cross-motions for summary judgment will proceed in five parts, addressing the following questions in turn: (1) whether Fairfield failed to offer Student a FAPE for the 2015–16 school year; (2) whether the Spire School was an appropriate placement for the 2015–16 year; (3) whether equitable considerations negate Parents' right to reimbursement for Student's unilateral placement at the Spire School; (4) whether the Hearing Officer applied the wrong legal test in determining whether school officials were obligated to convene an IEP Team meeting, after Student's complaints about perceived bullying; and (5) whether Fairfield offered Student a FAPE for the 2014–15 school year.

### A. Ninth Grade (2015–16)

Student seeks reimbursement for expenses associated with her unilateral placement at the Spire School for the 2015–16 school year. See Pl.'s Mot. at 2. As noted above, in order to receive such reimbursement, Parents must show: (1) that Fairfield did not provide a FAPE for that year; (2) that the Spire School was an appropriate placement; and (3) that equitable considerations favor reimbursement. See J.C. v. Katonah-Lewisboro Sch. Dist., No. 16-1838, 2017 WL 1906729, at *1 (2d Cir. May 9, 2017) (summary order) (citing C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 73 (2d Cir. 2014)).

The parties disagree as to the correctness of the Hearing Officer's determination on each point. First, Student argues that this court should affirm the Hearing Officer's conclusion that the 2015–16 IEP was inappropriate, see Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. on Admin. Record ("Pl.'s Mem. in Supp." or "Plaintiff's Memorandum") (Doc. No. 34-1) at 1, 15, while Fairfield suggests that this conclusion should be reversed, see Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem. in Supp." or "Defendant's Memorandum") (Doc. No. 35-1) at 7. Second, Student urges the court to affirm the Hearing Officer's determination that the Spire School is an appropriate placement, see Pl.'s Mem. in Supp. at 19, while Fairfield argues for reversal, see Def.'s Mem. in Supp. at 15. Last, as to the equitable considerations prong of the test, the roles are reversed: Student argues that the Hearing Officer's evaluation of the equitable considerations at issue here should be reversed, see Pl.'s Mem. in Supp. at 21, while Fairfield argues that the Hearing Officer's decision on this point should be affirmed, see Def.'s Opp'n at 1–2.

The court will address each question in turn. Ultimately, the court concludes that the Hearing Officer properly found that the IEP for 2015–16 was not appropriate and that the Spire School was an appropriate placement. However, the court reverses the Hearing Officer's determination that equitable considerations counseled against awarding Parents reimbursement for Spire School tuition.

### 1.    Fairfield's IEP as a FAPE

Fairfield's protestations to the contrary notwithstanding, the Hearing Officer correctly concluded that the IEP offered for 2015–16 was inappropriate. The Hearing Officer acknowledged that the IEP's "goals and objectives were reasonably calculated

for Student to make progress in the areas of concern noted . . . and Student's grades indicate that she was able to make progress in the general education curriculum during the year . . . ." H.O. Decision at 17 ¶ 3.  However, "the therapeutic services offered were not sufficient for Student who was transitioning to high school and who suffers from significant anxiety which exacerbates her executive functioning issues." Id.  "[T]he inclusion of 30 minutes of counseling every two week[s] was not sufficient, even if Student was not going to attend the Aquaculture Program, with its multiple daily transitions which were inappropriate for the Student." Id.

The legal standard applicable in determining the propriety of IEPs is set out in detail above.  See supra Part III.A.  As the Supreme Court recently made clear, the IDEA requires that school districts provide "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 1001 (2017).  While district courts must subject hearing officers' determinations to independent judicial review, see Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998), decisions regarding the substantive adequacy of an IEP are entitled to some measure of deference, more so than are other determinations that IDEA hearing officers are called on to make, see M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012).

As a preliminary matter, for the purposes of deciding whether Fairfield offered a FAPE for the 2015–16 school year, the court notes that the September 2015 IEP is of virtually no relevance.  But see Def.'s Mem. in Supp. at 12–15 (discussing September 2015 PPT meeting).  Parents enrolled Student in the Spire School in late August, when

the operative IEP was the one discussed on April 21, 2015.  See Pl.'s Mem. in Supp. at 17.  Thus, in determining whether reimbursement is proper, the court looks to the IEP in effect at the time Parents effectuated the unilateral placement, rather than to any September 2015 alterations which were put in place after Parents had signed a contract with the Spire School and after the school year had begun.

Fairfield's arguments that the April 21, 2015 IEP was appropriate are grounded in its view that, at the time the PPT met in April 2015, there was no indication in Student's educational or medical history that thirty minutes of counseling every two weeks would be insufficient.  See Def.'s Mem. in Supp. at 9–10 (citing L.O. v. N.Y.C. Dep't of Educ., 822 F.3d 95, 113 n.15 (2d Cir. 2016), for proposition that IEPs "must be evaluated prospectively as of the time of [their] drafting").  Student disagrees, arguing that there were indications prior to April 2015—and in the record before the Hearing Officer—that Student required substantial emotional support.  See Pl.'s Opp'n at 5–6.  Student offers several additional justifications for a finding that the IEP was inappropriate, though the Hearing Officer did not rest her decision on any of these bases.  See generally Pl.'s Mem. in Supp. at 15–19; Pl.'s Opp'n at 3–8.

The Hearing Officer's determination that the 2015–16 IEP did not provide sufficient counseling is a conclusion as to the substantive adequacy of an IEP and, because it is well reasoned, it is entitled to some degree of deference from this court. See M.H., 685 F.3d at 244.  Upon independent review, and giving appropriate deference to the Hearing Officer's decision, the court concludes that the 2015–16 IEP did not provide Student with a FAPE, because it provided insufficient counseling services.

Fairfield's contention that "no information was available at the time to the PPT [in April 2015] indicating that 30 minutes of counseling every two weeks for anxiety issues might not be sufficient," see Def.'s Mem. in Supp. at 10, is unavailing. Admittedly, the analyses demanded by the IDEA require somewhat speculative inquiries into what services might or might not be appropriate for a given student. However, it is not the case that the Hearing Officer's conclusion that the April 2015 IEP provided insufficient counseling was "pure speculation," as Fairfield contends. See Def.'s Mem. in Supp. at 11. In advance of the April 2015 PPT meeting, Dr. Heitzman sent an email to Fairfield officials indicating that Student had "[l]ots of issues" related to her feeling that she did not have "others to love and to provide her with a sense of belonging," and that Student was "not even close to achieving" "feelings of self-worth, respect for self and respect from others." Parents' Ex. 90 at 1.[3] This email came several months after the October 27, 2014 IEP noted that Student was not performing at an "Age Appropriate" level in the "Behavioral/Social/Emotional" Area. See Bd.'s Ex. 138B at 5. Furthermore, in his testimony before the Hearing Officer, Dr. Heitzman repeatedly discussed his concerns—expressed to Fairfield in April 2015—regarding Student's anxiety, its triggers, and its consequences. See, e.g., Mar. 8, 2016 Hr'g Tr. at 195:18–195:24, 199:12–199:15, 202:8–202:13, 227:15–227:18.

Fairfield also places great weight on Parents' apparent failure to object to the IEP proposed in April 2015 on the specific grounds that it did not provide sufficient counseling services, instead trumpeting its employees' suggestion that counseling

---

[3] All citations to exhibits and testimony introduced before the Hearing Officer refer to documents filed manually and under seal, in order to protect the privacy of Student.

should be added for the first time.  See Def.'s Mem. in Supp. at 10; Def.'s Reply at 2–3.

Accepting Fairfield's description of the development of the April 2015 IEP, it seems

highly relevant, in deciding whether the IEP was adequate, that Fairfield viewed Student

as having such severe emotional problems that it suggested adding counseling services

sua sponte.  See Def.'s Mem. in Supp. at 10 ("Although no request for counseling was

made by the Parents or their representatives, counseling for anxiety was added as a

new service in the April 2015 IEP at the suggestion of the school-based [PPT]

members." (citation omitted)).

In sum, despite Fairfield's citations to certain information in the record that might

support its arguments, see, e.g., Def.'s Mem. in Supp. at 10–11; Def.'s Reply at 1–2, the

Hearing Officer had before her a substantial amount of information suggesting that

Student "suffers from significant anxiety which exacerbates her executive functioning

issues," H.O. Decision at 17 ¶ 3.  Her conclusion regarding the substantive adequacy of

the IEP is therefore entitled to deference in this court's independent review.  Because

the court concludes that the 2015–16 IEP was inappropriate, it need not reach Student's

additional arguments regarding the substantive inadequacy of the ninth grade IEP.  See

generally Pl.'s Mem. in Supp. at 15–19; Pl.'s Opp'n at 3–8.

The court denies Fairfield's Motion for Summary Judgment, insofar as it asks the

court to find the 2015–16 IEP appropriate, and grants Student's Motion for Summary

Judgment, insofar as it seeks affirmance of the Hearing Officer's decision on this point.

2.      Spire School as an Appropriate Placement

The Hearing Officer also concluded that the Spire School was an appropriate

unilateral placement for Student.  See H.O. Decision at 20–21 ¶ 6.  Noting that the Spire

School is a "state approved private special education school," and acknowledging that the School "is clearly a restrictive environment," the Hearing Officer found that "it is appropriate for the purposes of a unilateral placement." See id.

As discussed more extensively above, see supra Part III.A, parents may receive reimbursement for unilateral placements when the public school district does not offer a FAPE in a timely manner, see 20 U.S.C. § 1412(a)(10)(C)(ii). However, the private school in which the student is placed must be appropriate, which requires that the unilateral placement meet most of the same criteria the school district's IEP must meet. See Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 364 (2d Cir. 2006). Most relevant here, parents "may not be subject to the same mainstreaming requirements as a school board." Id. (quoting M.S. ex rel. SS. v. Bd. of Educ. of City Sch. Dist. of City of Yonkers, 231 F.3d 96, 105 (2d Cir. 2000)). Indeed, the Second Circuit has admonished hearing officers for giving dispositive weight to the restrictiveness of a unilateral placement in finding it inappropriate. See C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 839–40 (2d Cir. 2014) ("[T]he [hearing officer] improperly gave dispositive weight to the restrictiveness of [the unilateral placement] in reaching the conclusion that it was inappropriate for [the student].").

Fairfield's argument that the Spire School is an inappropriate unilateral placement is grounded in its belief that the School is "overly sheltered, insular and restrictive." Def.'s Mem. in Supp. at 19, 21. Fairfield suggests the inappropriateness of the Spire School is evidenced by Student's becoming more dependent on prompting from teachers and staff. See id. at 20. By contrast, Student points to evidence that she has improved in many areas identified for additional attention/instruction, see Pl.'s

Opp'n at 9–13, and suggests that Fairfield's challenge to the small class sizes at the Spire School runs contrary to the philosophy underpinning the IDEA, see id. at 11.

Fairfield candidly admits that Student "is doing well academically, has made friends, and is participating in clubs and the student council at Spire." Def.'s Reply at 7; see also Def.'s Mem. in Supp. at 19. Nevertheless, the Board insists that this progress is to be disregarded because Student's success has come about "in the context of a very small and insulated community of peers." See Def.'s Reply at 7. The Hearing Officer rightly rejected this dismissive attitude toward Student's achievements, and toward the Spire School in general.

The Hearing Officer found—and Fairfield appears not to dispute—that the Spire School is a state-approved private special education school. See H.O. Decision at 15 ¶ 93; Pl.'s L.R. 56(a)1 at 11 ¶ 42; Def.'s L.R. 56(a)2 at 5 ¶ 42. The Spire School staff includes fifteen certified teachers, four special education teachers, a clinical psychologist, a licensed professional counselor, a social worker, and two school counselors. See id. at 15 ¶ 94. Similarly, there is no dispute that Student's peers at the Spire School "have mild to moderate learning disabilities and some sort of social or emotional needs such as anxiety, depression or a mood disorder and are on or at grade level." Id. Moreover, many of Student's classes include only a handful of other students. See Def.'s Mem. in Supp. at 19; Pl.'s Opp'n at 10.

Nevertheless, Fairfield urges the court to afford no deference to the Hearing Officer's determination that the Spire School is an appropriate placement, because "[t]he [H]earing [O]fficer neither mentioned the evidence of Student's extremely small academic class sizes consisting exclusively of students requiring special education

services nor considered the harm to Student from such a severely restrictive educational environment." <u>See</u> Def.'s Reply at 8.  This mischaracterizes the Hearing Officer's decision.  To be sure, the Hearing Officer did not make extensive findings or offer a lengthy discussion about the small class sizes at the Spire School.  She did, however, find that students at the Spire School all had mild to moderate learning disabilities and social or emotional needs.  <u>See</u> H.O. Decision at at 15 ¶ 94.  Most importantly, in reaching her decision, the Hearing Officer unequivocally expressed awareness of the restrictiveness of the Spire School, though she ultimately found Spire appropriate as a unilateral placement.  H.O. Decision at 20 ¶ 6 ("<u>The Spire School is clearly a restrictive environment</u>, however it is appropriate for the purposes of a unilateral placement." (emphasis added)).  Therefore, Fairfield's suggestion that the Hearing Officer ignored these characteristics of the Spire School ring hollow.  Because Parents were not subject to the same mainstreaming requirements as is Fairfield, <u>see</u> <u>Frank G. v. Bd. of Educ. of Hyde Park</u>, 459 F.3d 356, 364 (2d Cir. 2006), they were not obligated to "demonstrate that the Student required classes with a three or four-to-one student/teacher ratio or a self-contained setting limited solely to special education students in order to obtain educational benefits," <u>see</u> Def.'s Reply at 8.

Moreover, though Fairfield cherry-picks evidence from the record that it claims indicates Student has regressed at the Spire School, <u>see</u> Def.'s Reply at 5–7, the preponderance of the evidence indicates to the contrary.  There is little doubt that not all of Student's issues are resolved.  <u>See</u> Pl.'s Opp'n at 9–10 (acknowledging that Student "exhibited anxiety and executive dysfunction when she started at the Spire School," that she "ate pencils" during the first part of ninth grade, and that she received help from

teachers who scribed her homework and tests, when necessary); Mar. 1, 2016 Hr'g Tr. at 105:6–105:13 (Seese). Several witnesses, however, recounted in glowing terms Student's improvement emotionally and socially at the Spire School. See, e.g., Mar. 8, 2016 Hr'g Tr. at 91:15–91:18 (Heitzman) ("I think her anxiety is always going to interfere with learning, but it happens much less at Spire. You know, this past year, it's happened less, I would say."); Mar. 21, 2016 Hr'g Tr. at 123:1–123:3 (Spire School Life Coach Chelsea Horblitt) ("The kids love her. She's on student council. She—she feels very confident and that—that just shows in her friendships."); Mar. 1, 2016 Hr'g Tr. at 106:20–106:23 (Seese) ("[S]he feels much more comfortable. I think she has been willing to take more risks than she ever did before."). It is hardly a surprise that Student's anxiety and emotional challenges were temporarily exacerbated by her transition to a new school. Nevertheless, the weight of the evidence suggests that Student has performed well academically and has improved socially and emotionally at the Spire School. Though Student continues to struggle with executive functioning issues, the evidence suggests that the Spire School has worked to develop a plan to address these issues. See Mar. 21, 2016 Hr'g Tr. at 103:13–104:16.

Fairfield never offers any citation to the record or support for its rhetoric about the purported dangers of placing Student in small classes. See, e.g., Def.'s Mem. in Supp. at 20 ("Given the cloistered, overly restrictive environment at Spire and her lack of progress there in coping independently with her executive function issues, upon graduation what chance does Student have of successfully adjusting to college, even at a small college?"). By contrast, there was plenty of evidence in the record to suggest that Student is, for the most part, making progress at the Spire School. See, e.g.,

Mar. 8, 2016 Hr'g Tr. at 91:15–92:2; Mar. 21, 2016 Hr'g Tr. at 122:9–123:20. Even more important, Fairfield's suggestion that the Hearing Officer neglected to consider the restrictiveness of the Spire School is undermined by even a cursory reading of the Hearing Officer's Decision. As such, the court concludes that the Hearing Officer's decision was well-reasoned and supported by a preponderance of the evidence.

Fairfield's Motion for Summary Judgment is denied, insofar as it seeks reversal of the Hearing Officer's conclusion that the Spire School was an appropriate unilateral placement. Student's Motion for Summary Judgment is granted, insofar as it sought to affirm that portion of the Hearing Officer's Decision.

### 3. Equitable Considerations

With the court having determined that the 2015–16 IEP was inappropriate and that the Spire School was an appropriate unilateral placement, Student is entitled to her tuition costs for the Spire School if the equities favor reimbursement. See J.C. v. Katonah-Lewisboro Sch. Dist., No. 16-1838, 2017 WL 1906729, at *1 (2d Cir. May 9, 2017) (summary order) (citing C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 73 (2d Cir. 2014)). "[A] district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) (citing Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 16 (1993)). "Important to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA." C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 840 (2d Cir. 2014) (citing Warren G. ex rel. Tom G. v. Cumberland Cty. Sch. Dist., 190 F.3d 80, 85–86 (2d Cir. 1999)).

The Hearing Officer decided that the equities did not favor reimbursement for tuition at the Spire School for the 2015–16 school year, "due to the refusal to consent to the evaluation for ESS and the unreasonableness of Parents['] actions in choosing not to cooperate with the District in its efforts to find the least restrictive placement for their child." See H.O. Decision at 20–21 ¶ 7. The Hearing Officer began by noting the Board's obligation to educate special education students with other students to the "maximum extent appropriate." See id. (citing 34 C.F.R. § 300.114(a)(2)). According to the Hearing Officer, Parents' refusal to participate in the intake process for ESS "because they were afraid Student would be singled out as a special education student was unreasonable," and obstructed the Board's ability to comply with its mainstreaming obligations under the IDEA.[4] See id.

Student suggests that the Hearing Officer made numerous errors in reaching her conclusion that the equities did not favor reimbursement, most notably that basing her conclusion on the refusal to participate in the ESS intake process was error. See Pl.'s Mem. in Supp. at 23–25; Pl.'s Reply at 5–6. By contrast, Fairfield urges affirmance on the grounds that the dispute over ESS was properly considered, and that the Parents were generally uncooperative with the Board from the time Student lost interest in attending the aquaculture program. See Def.'s Opp'n at 24–27.

_____

[4] Some of Student's briefing on the pending Motions appears to suggest that the Hearing Officer's determination on this issue should be reversed because "she measured the restrictiveness of the private placement at the Spire School against the restrictiveness of the Fairfield public school option." See Pl.'s Mem. in Supp. at 22. This is not an accurate description of the Hearing Officer's Decision: the Hearing Officer faulted Parents for not cooperating with Fairfield's efforts to fulfill its own mainstreaming obligations. See H.O. Decision at 20–21 ¶ 7; Def.'s Opp'n at 24. Therefore, Student's arguments for reversal of the Hearing Officer's Decision on the grounds that she improperly imposed a requirement that Parents' unilateral placement qualify as the "least restrictive environment" is without merit.

At the outset, the court notes that the Hearing Officer's determination as to the equitable considerations is entitled to minimal deference: it is not the type of question on which the Hearing Officer might be expected to bring special expertise to bear.  In conducting its own, independent review of the record, this court concludes that the Hearing Officer's reliance on the ESS intake process as indicative of Parents' lack of cooperation, see H.O. Decision at 20–21 ¶ 7, was misplaced.  To be sure, courts—and hearing officers—are given broad discretion in deciding which factors are relevant to deciding whether equitable considerations favor reimbursement.  See Galiardo, 489 F.3d at 112.  That being the case, the Hearing Officer was, and this court is now, permitted to take into account the dispute that arose at the September 2015 PPT meeting regarding the ESS intake process.

Yet Parents' refusal to participate in that process can hardly support the weight the Board would have the court place on it.  At the time Fairfield asked Parents to participate the ESS intake process, they had already signed a contract with the Spire School and the school year had already begun.  See H.O. Decision at 14 ¶¶ 81–82.  As such, Parents' rejection of the invitation to participate in the ESS intake process— whether reasonable or not—has little bearing on whether equitable considerations justify reimbursement for the 2015–16 school year.[5]  It certainly does not support a conclusion that Parents are not entitled to reimbursement for 2015–16 tuition, where the IEP has been found deficient and the unilateral placement appropriate.

_____

[5] Though the Hearing Officer explicitly based her conclusion that the equities did not favor reimbursement for 2015–16 tuition on the Parents' refusal to participate in the ESS intake process, see H.O. Decision at 20–21 ¶ 7, her focus on this issue would have been proper in considering whether to award the two years of prospective placement at the Spire School that Student also requested, see id. at 21 ¶ 8.  Here, by contrast, Parents are not requesting prospective reimbursement.

Having rejected the Hearing Officer's justification for denying reimbursement, the court now turns to the other grounds Fairfield suggests justify a determination that the equities do not favor reimbursement. Fairfield claims several times that Parents engaged in misleading, dishonest conduct leading up to their notifying the Board of the unilateral placement at the Spire School. See Def.'s Opp'n at 22, 24–25. The Hearing Officer did not invoke any such finding in concluding that reimbursement was inappropriate. The Hearing Officer did find that "Parents did not notify the District that Student was no longer interested in attending the Aquaculture program" in June 2015. See H.O. Decision at 14 ¶ 79. However, the Hearing Officer did not draw any explicit, adverse inference against Parents from this fact, nor did she express any belief that Parents had already decided to send Student to private school or that Student had categorically ruled out attending the aquaculture program. Mother testified that she began considering private school options for Student in June 2015 in light of the concerns Student expressed about attending the aquaculture program, but that, "if [Student] had gone to [public high school], she would have gone to Aqua [the aquaculture program]." See Mar. 21, 2016 Hr'g Tr. at 58:14–59:18.

Though Parents were clearly dissatisfied with Fairfield's proposed IEP, it does not appear that they were engaged in the duplicitous conduct that Fairfield ascribes to them. See Def.'s Opp'n at 22 (accusing Parents of "deliberately fail[ing] to notify the District until August 2015" that Student would not attend the aquaculture program). Specifically, Fairfield does not point to any concrete evidence to support their claim that Parents acted "in order to deprive the District of the opportunity to convene a PPT meeting before the end of the school year." See id. at 25. Given that Parents informed

Fairfield of their intent to effectuate the unilateral placement at least ten days before they signed a contract with the Spire School and that Parents had not yet decided to pursue private school options for Student at the time of the most recent IEP meeting, the court concludes that reimbursement should not be reduced or denied for failure to give Fairfield adequate notice.  See 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa)–(bb).

To the extent that Fairfield argues that Dr. Seese's failure to contact school officials in preparing her report for parents was inequitable, see Def.'s Opp'n at 22, that argument is unpersuasive.  According to Fairfield, this lack of contact was indicative of Parents having already selected the Spire School for a unilateral placement.  See id. However, as noted above, parents' subjective intent regarding whether they will keep their child in public school has no relevance to the equitable analysis, absent some "relevant manifestation of that intent . . . ."  A. v. Greenwich Bd. of Educ., No. 3:15–cv–203 (CSH), 2016 WL 3951052, at *19 (D. Conn. July 20, 2016); see also C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 840 (2d Cir. 2014).  It does not appear that the documents or information collected by Dr. Seese in preparing her report is "relevant" in any way: whatever Parents' subjective intent was, preparation of an independent report hardly indicates a lack of cooperation cognizable in this equitable analysis.

Last, Fairfield takes aim, once again, at Parents' refusal to embrace its employees' assertions that collaborative classes were "just as academically rigorous as other classes," asserting that Parents' "concerns were unfounded."  Def.'s Opp'n at 22; see also id. at 25 ("The Parents removed Student because they did not want her to attend collaboratively taught classes in ninth grade.").  To be sure, there is evidence in

the record to suggest that skepticism of collaborative classes may indeed have been the motivating factor in Parents' decision to effectuate a unilateral placement. <u>See</u> Mar. 21, 2016 Hr'g Tr. at 58:14–59:10. Again, though, parents' subjective intent regarding whether they will keep their child in public school is generally not relevant to this equitable considerations analysis. <u>C.L.</u>, 744 F.3d at 840. Here, Fairfield asks the court to conduct the type of inquiry into subjective intent that has no bearing on determining whether reimbursement is appropriate: the Hearing Officer and this court have determined that the IEP did not provide a FAPE, whether Parents' concerns about collaborative classes were unfounded or not. At any rate, there was no specific conduct stemming from this belief that is inequitable.

Because the aspersions Fairfield casts upon Parents are unsupported by the record, and because Parents' refusal to consent to the ESS intake process is of virtually no relevance in determining whether reimbursement for 2015–16 is appropriate, the court concludes that reimbursement for 2015–16 tuition at the Spire School is proper. Parents apparently acted in good faith and cooperatively, until they became disenchanted with Fairfield's IEP—one that this court has found inadequate—and sought a unilateral placement for their daughter. The equities favor tuition reimbursement, and so the court grants Student's Motion for Summary Judgment, insofar as it seeks reversal of the Hearing Officer's determination of the balance of the equities.

B. <u>Eighth Grade (2014–15)</u>

In addition to claiming the inappropriateness of Fairfield's 2015–16 IEP, Student claims she was not provided with a FAPE for her eighth grade year, 2014–15, during

which she attended public middle school. The Hearing Officer concluded that the IEP offered for eighth grade was appropriate. See H.O. Decision at 17–19 ¶¶ 4–5. Accordingly, she denied Parents' request for reimbursement of private tutoring and counseling expenses. See id. at 21–22 ¶ 8.

Claiming that the Hearing Officer's "conclusion is logically inconsistent with her finding that the program for the ninth grade was not appropriate because the therapeutic services were not sufficient for the Student," Pl.'s Mem. in Supp. at 26 (quotation marks and citation omitted), Student argues that she is entitled to reimbursement for these expenses, see id. at 31, 39. Student offers four justifications for her belief that the IEP was inappropriate: (1) that bullying or perceived bullying so interfered with Student's education that she was denied a FAPE, see generally id. at 26–31; Pl.'s Reply at 6–11; (2) that Student's IEP did not provide sufficient emotional support, see generally Pl.'s Mem. in Supp. at 32–33; Pl.'s Reply at 11–12; (3) that Student's IEP did not appropriately address "her profound executive functioning disability," see generally Pl.'s Mem. in Supp. at 33–36; and (4) that the absence of writing goals at the beginning of the 2014–15 school year rendered the IEP per se inappropriate, see generally Pl.'s Mem. in Supp. at 36–37; Pl.'s Reply at 12–13. Unsurprisingly, Fairfield disagrees on each point. See generally Def.'s Opp'n at 4–10 (bullying), 10–14 (emotional support), 14–18 (executive functioning), 18–20 (writing).

The court addresses each point in turn, and concludes that the Hearing Officer was correct: the 2014–15 IEP offered a FAPE, and Student and Parents are not entitled to reimbursement for either private tutoring or counseling.

1. Bullying

The Hearing Officer concluded that Student was not denied a FAPE as a result of bullying during her eighth grade year.  See H.O. Decision at 17 ¶ 5.  Invoking the four-part test set out in T.K. v. New York City Department of Education, 779 F. Supp. 2d 289 (E.D.N.Y. 2011), the Hearing Officer found that the conduct alleged did not meet the definitions of bullying set out either by Connecticut statute, see Conn. Gen. Stat. § 10-222d, or by United States Department of Education Office of Special Education Programs, see Dear Colleague Letter, U.S. Dep't of Educ., Office of Special Educ. & Rehabilitative Servs. (Aug. 20, 2013) ("Dear Colleague Letter").[6]  See H.O. Decision at 18–19 ¶ 5.  Thus, the first prong of the T.K. test was not met.  Even assuming arguendo that the acts reported by Mother and Student qualified as bullying, the Hearing Officer found that Fairfield officials were not "indifferent to Student's reports and took reasonable steps to address issues as staff were made aware of them"; therefore, the third prong of T.K.'s test was not satisfied.  See id.  Because the Hearing Officer determined that Student fell short at both the first and third prongs of the T.K. analysis— the test for which Student apparently advocates—the alleged bullying did not qualify as a substantive denial of a FAPE.  See id.

Student's argument is somewhat difficult to parse.  She appears to argue that incidents of bullying by teachers and peers in seventh grade provide support for a conclusion that she was denied a FAPE in eighth grade.  See Pl.'s Mem. in Supp. at 28, 30 (invoking incident with Spanish teacher that took place during seventh grade).  She

_____

[6] This document is available at:
https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/bullyingdcl-8-20-13.pdf.

also faults the Hearing Officer for focusing on the definition of bullying set out by Connecticut statute, rather than "whether the perceived harassment is interfering with [ ] Student's ability to access her education . . . ." See id. at 28. More significantly, however, Student's theory appears to be that her unsubstantiated reports of bullying during eighth grade obligated Fairfield to call a PPT meeting to address these reports, and that the Board's failure to do so violated her right to a FAPE. See id. at 28–29. Indeed, Student makes clear that, in her view, "[t]he fact that [ ] Student perceived bullying that school administrators were unable to verify is evidence of the Student's severe disability and her need for far more intense services." Pl.'s Reply at 8. The suggestion is, of course, that it matters not at all whether Student was actually bullied, but rather that unconfirmed allegations to that effect trigger obligations on the part of the school district.

Student repeatedly obfuscates the obvious difference between this case and the bullying described in T.K., proscribed by Connecticut statute and condemned in U.S. Department of Education guidance: none of the reports of bullying alleged to have occurred during Student's eighth grade year were substantiated. Specifically, Student invokes aspects of T.K. that she believes are favorable to her case, see, e.g., Pl.'s Mem. in Supp. at 30–31 ("The factual parallels with T.K. are uncanny."), while glossing over the lack of substantiation for her bullying claims. Nevertheless, the court agrees with Student that T.K. provides a useful "standard for finding a substantive violation of a [s]tudent's right to a FAPE." See Pl.'s Mem. in Supp. at 27.[7] T.K. set out a four-part

_____

[7] In fact, neither party objects to the use of the test set out by Judge Weinstein in T.K. See Pl.'s Mem. in Supp. at 27, 30–31; Def.'s Opp'n at 6–10; Pl.'s Reply at 7.

inquiry to determine whether bullying has caused a substantive denial of a FAPE:

(1) whether the student was the victim of bullying, see 779 F. Supp. 2d at 317;

(2) whether the school had notice of substantial bullying of the student, see id. at 318;

(3) whether the school failed to take reasonable steps to address the harassment, see id.; and (4) the bullying caused the student's educational benefit to be adversely affected, see id.

At the outset, it is the court's view that the incidents in which Student was teased during seventh grade—which were confirmed—are of minimal relevance in determining whether alleged bullying in eighth grade interfered with Student's right to a FAPE. But see Pl.'s Reply at 6 ("Although seventh grade is not at issue, the accumulation of events is relevant to understanding [ ] Student's individual emotional needs during eighth grade."). The relevant focus of the court's inquiry into whether alleged bullying resulted in the denial of a FAPE for eighth grade is those incidents that occurred in eighth grade.[8]

With regard to the first prong of the T.K. test, the court need not decide whether the definition of bullying set out in Connecticut statute, which Student disfavors and claims the Hearing Officer should not have invoked, or the description of bullying in OSEP's Dear Colleague Letter should govern claims of the substantive denial of a FAPE. Both require that bullying or some kind of harassment actually have taken place. See, e.g., Dear Colleague Letter at 2. Neither addresses "perception[s] of

---

[8] The Hearing Officer likely discussed the bullying incidents in seventh grade in greater detail, see H.O. Decision at 18–19 ¶ 5, because one of the questions she addressed that is not at issue before this court was whether Fairfield denied "Student a FAPE for that portion of the 2013-2014 school year beginning on September 23, 2013 and running through the conclusion of the school year," see H.O. Decision at 22 ¶ 1.

mistreatment . . . ."  See Pl.'s Reply at 7.  As such, Student was not the subject of

bullying under either definition during her eighth grade year.

Student's claims also fail under the third prong of the T.K. test because,

notwithstanding her assertions to the contrary, see Pl.'s Mem. in Supp. at 29 (criticizing

"school's tepid investigations"), on the record before the court, Fairfield promptly and

diligently investigated each instance of alleged bullying.  Setting aside Student's

hyperbole, she points to no record evidence that would indicate Fairfield's investigations

were unreasonable or inadequate.  The Hearing Officer concluded that the weight of the

evidence suggested that "the District was not indifferent to Student's reports and took

reasonable steps to address issues as staff was made aware of them."  See H.O.

Decision at 19 ¶ 5.  The court agrees.  Therefore, Student's claims that bullying denied

her a FAPE fail at both the first and third steps of the T.K. framework.

Embracing Student's preferred analysis—which looks to a student's perception of

bullying—would render the IDEA unworkable for the school districts charged with

complying with it.  It would make little sense to require that schools convene PPT

meetings every time a student complains of bullying, when those claims cannot be

confirmed.  When reports of bullying are substantiated or clearly and directly interfere

with a disabled child's ability to receive a FAPE, see T.K., 779 F. Supp. 2d at 318; 20

U.S.C. § 1414(d)(4)(A)(ii)(I), such intervention may well be appropriate.  Here, there is

no such obvious link between the unconfirmed reports of bullying and any inability to

access a FAPE.  The court cannot conclude that the IDEA requires schools to convene

the PPT whenever they receive such unsubstantiated allegations of bullying.

In sum, Student's allegations of bullying do not meet the test set out in T.K. for substantive denial of a FAPE: her claims could not be confirmed, after reasonable investigation by the school district. As such, the court denies Student's Motion for Summary Judgment, insofar as it seeks a determination that she was denied a FAPE as a result of instance of perceived bullying during the 2014–15 school year.

2.    Fairfield's IEP as a FAPE

The Hearing Officer concluded that "[t]he District did not deny Student a FAPE for the 2014-2015 school year." H.O. Decision at 22 ¶ 2. In this appeal from the Hearing Officer's Decision, Student claims: (1) that she was provided with insufficient emotional support services, see Pl.'s Mem. in Supp. at 32–33; Pl.'s Reply at 11–12; (2) that her "profound executive functioning disability" was not addressed, see Pl.'s Mem. in Supp. at 33–36; Pl.'s Reply at 14–15; and (3) that omission of writing goals from her IEP for the first months of eighth grade deprived her of a FAPE, see Pl.'s Mem. in Supp. at 36–37; Pl.'s Reply at 12–13. Student asserts that she "is not asking the court to second guess the factual determinations made by the Hearing Officer. Instead, Plaintiff is asking the court to review the logical and legal conclusions reached from those facts." See Pl.'s Reply at 11. Once again, Fairfield disagrees on each point. See Def.'s Opp'n at 10–14 (emotional support), 14–18 (executive functioning), 18–20 (writing goals).

As set forth in more detail below, the court concludes that none of Student's claims of error in the Hearing Officer's decision are persuasive. Fairfield provided Student with a FAPE for the 2014–15 school year.

a. Emotional Support

The crux of Student's claim that emotional support services should have been provided in the 2014–15 IEP is her contention that the Hearing Officer's conclusion is "logically inconsistent with her finding that the program for the ninth grade was not appropriate because 'the therapeutic services [offered] were not sufficient for the Student . . . .'" See Pl.'s Mem. in Supp. at 26 (quoting H.O. Decision at 17 ¶ 3). This claim of logical inconsistency is easily rejected: it does not follow from the Hearing Officer's conclusion that Student needed more extensive counseling services for ninth grade—when, for example, she would have been transitioning to a new school (or to a new school and the aquaculture program)—that a FAPE for the 2014–15 school year would also have included such extensive services. While that might be the case, Student's claim that she required counseling services in 2014–15 must succeed or fail independently, on its merits, rather than necessarily following from the Hearing Officer's conclusion regarding the ninth grade IEP.

Setting aside Student's "logical[ ] inconsisten[cy]" argument, there is not evidence in the record to support a conclusion that the 2014–15 IEP was insufficient for failure to include counseling services. Student relies primarily on communications from Dr. Heitzman to school officials, in which Student says Dr. Heitzman told the school psychologist, Walter Young ("Young"), that Student "required regular counseling." See Pl.'s Mem. in Supp. at 32 (citing Mar. 8, 2016 Hr'g Tr. at 45–48). Contrary to Student's characterization of this testimony, Dr. Heitzman said no such thing. Rather, he testified that he was concerned that Student did not understand how to meet with Young, and advised that Young should proactively reach out to Student, given her negative

experience over the summer.  See Mar. 8, 2016 Hr'g Tr. at 47:10–48:6;[9] see also id. at

162:3–162:8 ("I wasn't recommending weekly counseling with [Student].  I was

recommending that she needs it, and this would be a good time to set up what ['as-

needed'] means.").  Although Dr. Heitzman indicated his belief that Student should meet

with Young at the beginning of the school year, he did not suggest that Young should

set regular meeting times.[10]

Relatedly, Student claims that she "was not permitted to [see Young] on a regular

basis."  See Pl.'s Mem. in Supp. at 32.  In support of this claim, she cites to one specific

instance, in which one of Student's special education teachers did not let her speak to

Young until she "had a solution."  See Bd.'s Ex. 179 at 39–40.  Though a meeting was

apparently set up to address concerns about this teacher preventing Student from

speaking with Young, see id., there is no indication in the record that Student was

prevented from meeting with Young "on a regular basis" or that this single incident so

disrupted her education as to interfere with her right to a FAPE.  All of the testimony to

which Student points is either related to this one, apparently isolated incident, see

Mar. 18, 2016 Hr'g Tr. at 44:14–44:22; Mar. 21, 2016 Hr'g Tr. at 19:3–20:22—from

which she expands to make much broader claims about the unavailability of counseling

than are supported by the evidence—or are nonspecific, see Mar. 8, 2016 Hr'g Tr.

---

[9] In part, Dr. Heitzman testified as follows: "[W]hat I was asking Walter [Young] to do was to try to extend himself to find her [Student] in the beginning of the year, find her in the beginning and sit down with her even to review some of the things that happened, review some of the summer.  Review how she was feeling, but also to sit down and to define what it means to be as needed.  You know, what—how that's going to work, just so she had a working knowledge of that."  Mar. 8, 2016 Hr'g Tr. at 47:22–48:6.

[10] Any suggestion by Dr. Seese that "Student had serious emotional issues at the beginning of eighth grade [fall of 2014]," see Pl.'s Mem. in Supp. at 32 (citing Mar. 1, 2016 Hr'g Tr. at 76), is of very little weight.  Dr. Seese did not meet Student until the spring of 2015.  See Pl.'s L.R. 56(a)2 at 9 ¶¶ 27–28.

at 49:1–51:3. To the extent Student is unhappy that Young was not <u>always</u> available when she wanted to speak with him, <u>see</u> Pl.'s Mem. in Supp. at 32 (citing Mar. 18, 2016 Hr'g Tr. at 105, in which Mother indicated that Student sometimes could not see Young because she "had to schedule an appointment, and the appointment would not be right at that instant" or because "he was in a meeting"), there is no evidence to suggest that this deprived Student of a FAPE.

The evidence to which plaintiff points is unpersuasive, and the court thus concludes by a preponderance of the evidence that she was not denied a FAPE because of the 2014–15 IEP's failure to include emotional support services.

### b.     Executive Functioning

Student appears primarily to assert two related errors regarding the 2014–15 IEP and its executive functioning goals: first, that the Board tried to incentivize behaviors with a plan that had failed during seventh grade, <u>see</u> Pl.'s Mem. in Supp. at 34–35, and, second, that the IEP's inappropriateness is evidenced by significant "regression, not progress" on Student's executive functioning skills during eighth grade, <u>see</u> Pl.'s Reply at 14–15. Fairfield suggests that it revised the motivational methods regularly, <u>see</u> Def.'s Opp'n at 16–17, and that Student made "progress on her goals and objectives for the 2014[–]2015 school year, but with some variability," <u>see</u> <u>id.</u> at 14.

Student is correct that, when the PPT meets to review an IEP, it must revise the IEP "as appropriate, to address . . . [a]ny lack of expected progress toward the annual goals . . . and in the general education curriculum, if appropriate . . . ." <u>See</u> 34 C.F.R.

§ 300.324(b)(1)(ii)(A); see also 20 U.S.C. § 1414(d)(4)(A)(ii)(I).[11] Student refers to

testimony from Dr. Heitzman, in which he articulated his view that it was clear by

October 2014, that Student's behavior plan was not working. See Pl.'s Mem. in Supp.

at 34–35 (citing Mar. 8, 2016 Hr'g Tr. at 58–67). Notably, Student cites to no evidence

that suggests either that the school district had utilized these behavioral motivators in

seventh grade without success, or that Fairfield persisted in them knowing that they did

not work. On the other hand, there was evidence before the Hearing Officer—cited by

Fairfield, see Def.'s Opp'n at 16–17—that to the extent school officials were conscious

of shortcomings in the behavior plan in October 2014, they worked to address them.

See, e.g., May 6, 2016 Hr'g Tr. at 139:5–142:1; May 10, 2016 Hr'g Tr. at 16:4–16:24.

Therefore, the court cannot conclude by a preponderance of the evidence that Student's

right to a FAPE was violated by this alleged failure to modify behavioral motivation

techniques.

Next, Student claims that the data collected by Fairfield "clearly showed

regression, not progress." See Pl.'s Reply at 14. Student's argument is without merit.

Student claims that "[e]ighth grade was a year of profound regression on executive

functioning," without citing the record evidence from which she derives the figures she

offers.[12] See Pl.'s Mem. in Supp. at 34. On an independent review of the record, the

_____

[11] Because the court concludes that the evidence does not support a finding that Student was not making progress on her executive functioning goals, the court need not decide whether section 1414(d)(4)(A)(ii)(I) of title 20 of the United States Code imposes an obligation to call a PPT meeting anytime a Student is not making progress toward the annual goals. See Pl.'s Reply at 14. However, the court notes that, given the immediately preceding subsection, it might view Student's reading of the statute with some skepticism. See 20 U.S.C. § 1414(d)(4)(A)(i) (requiring only that IEP be reviewed "periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved").

[12] The court notes that the way in which plaintiff cites to the record in this portion of her briefing is entirely unhelpful. For example, Student writes that: "The behavioral data for eighth grade showed

court was unable to find a basis for the assertion of "profound regression" on these skills in eighth grade, but simply that the progress was, as might be expected, uneven. The data set forth in Fairfield's Exhibit 142A is separated by class and by week, which means there are presumably no more than five entries for many of these categories, i.e. Monday to Friday. See, e.g., Bd.'s Ex. 142A at 1 (measuring whether Student "Arrived to class on time"). That being the case, there is significant week-to-week and subject-to-subject variability in Student's success on these objectives. For example, during the week of September 22, 2014, Student arrived on time to Math 0% of the time, Social Studies 100% of the time, and Science 50% of the time, see id. at 1–2; during the week of March 2, 2015, she arrived to each of these classes on time 100% of the time, but only 50% of the time to Spanish and 75% of the time to Language Arts, see id. at 21–22. Such fluctuations are common in many of the other areas measured as well. Accordingly, there is not support in the record for the conclusion that eighth grade was a year of "profound regression." See id. at 24–26.

Though Student suggests that the IEP report on her eighth grade progress is deficient because of a failure to provide "data to evidence progress on her objectives," see Pl.'s Mem. in Supp. at 34 (citing Bd.'s Ex. 143 at 2–5), Fairfield appears to have

---

regression across numerous categories," citing to the Board's Exhibit numbered 142A. See Pl.'s Mem. in Supp. at 34. In the next five sentences, Student cites specific percentages that she claims reflect her success (or lack thereof) at achieving certain objectives "at the end of seventh grade" and "at the end of eighth grade," respectively. See id. Unfortunately, Student provides no citation to the record after any of these figures, and so it is impossible to verify or otherwise reference them. Exhibit 142A sets forth data collected from September through March of Student's eighth grade year, without any data from "the end of seventh grade" or from "the end of eighth grade."

Student's Reply is similarly wanting, insofar as she follows a claim that "[t]he data clearly showed regression, not progress" with an "Id." citation that referred back to a string cite referencing dozens of pages from each of two exhibits. See Pl.'s Reply at 14.

In the future, counsel for Student is advised to avoid citing to the record—which here includes thousands of pages of documents—in such an unhelpful way.

accompanied this report with further explication of its analyses, including some concrete data, see generally Bd.'s Ex. 144. Fairfield candidly acknowledges that the progress Student made was not unabated, see Def.'s Opp'n at 16, but, according to contemporaneous documentation, she made "Satisfactory" progress in most of her IEP goals in her eighth grade years, see generally Bd.'s Ex. 147.[13]

In light of the foregoing, the court concludes by a preponderance of the evidence that the 2014–15 IEP was not deficient for failure to provide for improvement in executive functioning.

c.    Writing Goals

Last, the court turns to Student's argument that the "lack of writing goal[s] [in the May 2014 IEP] per se rendered the IEP inappropriate." Pl.'s Reply at 12. The Hearing Officer resolved the factual dispute as to whether the writing goals were dropped inadvertently or purposefully, concluding that "[t]he record supports a finding that the District['s] statement that the goals were inadvertently dropped in the October IEP was inaccurate." H.O. Decision at 17 ¶ 4. She found it relevant that "[c]hanges to the goals and objectives were noted in the IEP summary," and that "[p]arents had a copy of the draft IEP without the writing goal before the [May 2014] PPT meeting." Id. Ultimately, the Hearing Officer concluded that Student was not denied a FAPE by the lack of writing goals for the first few months of her eighth grade year.

---

[13] Moreover, although not directly relevant to the question of whether Student improved her executive functioning skills, it does not appear in dispute that she succeeded academically in eighth grade: Student achieved grades between B- and A, with one exception, see Bd.'s Ex. 172, and exceeded school and district averages on state standardized testing, see Bd.'s Ex. 173.

Although Student's briefing could be read as seeking to relitigate whether the writing goals were removed purposefully or inadvertently, see, e.g. Pl.'s Mem. in Supp. at 37 (suggesting that Student was denied FAPE "[w]hichever story is true"), the court takes seriously her concession that she "is not asking the court to second guess the factual determinations made by the Hearing Officer," see Pl.'s Reply at 11. In any event, there was evidence before the hearing officer to support her finding. See, e.g., May 18, 2016 Hr'g Tr. at 62:13–63:4; June 2, 2016 Hr'g Tr. at 103:13–104:4. As such, and on the recommendation of Student, the court affords the determination of the Hearing Officer the proper measure of deference, and concludes by a preponderance of the evidence that the writing goals were removed purposefully.

Student is left with two arguments as to why this removal violated her right to a FAPE: (1) that she had a "substantial writing deficit" that was not addressed at the beginning of her eighth grade year, see Pl.'s Mem. in Supp. at 37; and (2) that the miscommunications between Fairfield and Parents—which Student characterizes as "deception" or "falsehood," see Pl.'s Mem. in Supp. at 37—constitute a procedural violation of the IDEA, see Pl.'s Mem. in Supp. at 37; Pl.'s Reply at 13. As for the first of these arguments, Student cites to no evidence that suggests she had a "substantial writing deficit," apart from noting that writing goals were included in an IEP developed after the December 23, 2014 PPT meeting. See Pl.'s Mem. in Supp. at 37. In her Reply, she does not address the issue. See Pl.'s Reply at 12–13. Moreover, Fairfield points out that Student received "writing support in general education cross curriculum" three times per week as a part of her May 2014 IEP, notwithstanding the lack of separate writing goals. See Def.'s Opp'n at 19 (citing Bd.'s Ex. 133 at 2). The court

thus concludes by a preponderance of the evidence that the lack of writing goals at the beginning of her eighth grade year did not constitute a substantive violation of Student's right to a FAPE.

Student also suggests that the conflicting messages from Fairfield officials regarding whether the writing goals were omitted purposefully "significantly impeded the parents' opportunity to participate in the [decision-making] process regarding the provision of a free appropriate public education" to Student. Pl.'s Mem. in Supp. at 37 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)(II)); Pl.'s Reply at 13 (same). Student's argument is unpersuasive. By all accounts, Parents received a draft of the IEP prior to the May 2014 PPT meeting. See May 3, 2016 Hr'g Tr. at 224:6–224:14. Student's assertions to the contrary notwithstanding, the record does not support a finding that Fairfield "significantly impeded the parents' opportunity to participate in the decisionmaking process" leading up to or in the immediate aftermath of the May 2014 PPT meeting. Similarly, whatever misimpression was conveyed by the October 2014 IEP's note that the writing goals were added in after being "inadvertently" omitted, there is no indication whatsoever that this miscommunication "impeded" at all, let alone "significantly impeded," Parents' ability to participate in the cooperative development of an IEP for their daughter. In fact, Parents appear to have achieved the outcome they desired: writing goals were added back to Student's IEP.

There is simply no indication that the removal of writing goals, and the interactions between Parents and Fairfield related thereto, violated Student's substantive or procedural rights under the IDEA. That being the case, the court

concludes by a preponderance of the evidence that the IEP for the 2014–15 school year was appropriate.

## V.    CONCLUSION

After addressing each parties' arguments in great detail above, the court summarizes its conclusions.

Student's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  It is granted insofar as it asks the court to affirm the determination of the Hearing Officer that the IEP provided for 2015–16 was not appropriate and that the Spire School was an appropriate placement.  Student's Motion is also granted insofar as it seeks reversal of the Hearing Officer's determination that the equities militate against reimbursement for the cost of the unilateral placement.  It is denied insofar as it seeks reversal of the Hearing Officer's conclusion that the 2014–15 IEP was appropriate, whether because of perceived bullying or because of a lack of sufficient emotional support, executive functioning, and writing-related services.

Fairfield's Motion for Summary Judgment is **DENIED** in all respects.

Student is entitled to Spire School tuition costs for the 2015–16 school year.  She is not entitled to reimbursement for private tutoring or counseling provided during the 2014–15 school year.

**SO ORDERED.**

Dated at New Haven, Connecticut this 7th day of July, 2017.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge